UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| WILLIAM MANSFIELD,<br><br>       Plaintiff,<br><br>v.<br><br>JEAN PIERRE MAUFRAS<br><br>       Defendant. | Case No. 12-CV-1277-JPS<br><br><br><br>ORDER |

   This is a case about two business partners' falling-out that certainly resulted in the dissolution of communication, and potentially resulted in the dissolution of their business partnership. Defendant Jean Pierre Maufras ("Maufras") removed this action to this court on December 14, 2012. (Docket #1). The original complaint, filed by plaintiff William Mansfield ("Mansfield") in the Ozaukee County Circuit Court, sought relief in the form of an injunction, and judicial dissolution of and appointment of a receiver for Maufras's and Mansfield's Wisconsin Limited Liability Partnership ("LLP"). (Docket #2). After removing this case, Maufras filed an answer and asserted counterclaims for theft, common-law conversion, specific performance, and an accounting. (Docket #3). Presently before the court is Mansfield's motion for partial summary judgment; in his motion, Mansfield seeks dismissal of Maufras's counterclaims for theft and common-law conversion. (Docket #22). The motion is fully briefed and ready for adjudication.

1.  Facts

  1.1 The Parties

   Mansfield and Maufras, both day traders in the equities markets, met in 2008 in a chat room of Trendfund, a website devoted to the online

education of market traders. Proposed Fact ("PF") (Docket #34) ¶ 3. Their online relationship continued until 2009, when they decided to create their own website for online training for market traders, which they named TideTraders. PF ¶ 4.

### 1.2 Business Operations

Maufras was the person principally responsible for building and maintaining the TideTraders website. PF ¶¶ 9, 16. Mansfield was principally responsible for the daily live webcasts during market hours and three days per week for longer hours. PF ¶ 15. The site would feature live audio and video of primarily Mansfield doing his daily trading, a forum for posting messages, a chat room similar to the chat room in which the parties met, and video and written materials of interest to their target market. PF ¶ 4.

Neither Mansfield nor Maufras contributed cash to TideTraders; instead they each incurred expenses to get the partnership formed, to build the website, and to have the website hosted by a third party, which expenses were reimbursed in full once the business started to generate revenues in 2010. PF ¶ 7. Virtually all of the business's revenues are generated from subscription fees charged to customers for access to the member-only broadcasts and other materials available on the website. PF ¶10. The subscription fees are collected exclusively through a PayPal account that Mansfield established before the business was commenced, and to which both Maufras and Mansfield had joint access once the business was running. PF ¶ 11. The PayPal account was also the business's principal checking account, so most of the bills, and all the distributions to the partners, were payed from this account. PF ¶ 12. At all times relevant to this case, the

business had just one other bank account, into which the partners set aside a savings of approximately 10% of the net revenues of the business. PF ¶ 13.

    1.3    Partnership Agreement

Mansfield purchased a kit from LegalZoom to create the paperwork for the formation of the partnership. PF ¶ 5. Although there is some confusion about whether Mansfield and Maufras both signed the original partnership agreement, the parties do not dispute that they both signed a copy when they briefly brought in a third partner in February 2011. PF ¶ 6.

The Limited Liability Partnership Agreement ("Agreement") is divided by subject into several Articles. (Docket #25-2). Article XII, entitled "Assignability of Partnership Interest," provides that no Partner shall "sell, assign, transfer or otherwise dispose of" his Partnership interest, "[e]xcept as set forth in the Certificate[1] or in Article XII(2)." Article XII(2) describes the procedure that Partners must use to allow the other Partners a right of first purchase when the selling partner has an offer from a third party.

Article XIII, entitled "Dissolution of Partnership," provides, in Paragraph 1, that except as provided in the Certificate or in Article XII :

> …no Partner shall have the right, power or authority at any time to withdraw or resign from the Partnership or to sell or dispose of all or substantially all of his Partnership Interest or otherwise transfer, dispose of or affect his Partnership Interest, whether voluntarily, involuntarily or by operation of law.

Paragraph 2 of the Article XIII provides that the Partnership shall be dissolved upon the occurrence of any of the following events:

---

[1]The Agreement defines "Certificate" as the "Certificate of Registered Limited Liability Partnership, as filed with the Secretary of State of the State of Wisconsin…." Neither party cites provisions of the Certificate as being relevant to the dispute in this case.

> (a) The retirement, adjudication of insanity or in competency [sic], death and/or adjudication of bankruptcy of any of the Partners...
>
> …
>
> (d) The occurrence of any other event causing the dissolution of a limited liability partnership under the laws of the State of Wisconsin.

Finally, the Agreement specifies that "all questions with respect to the construction, enforcement and interpretation of this Agreement and the rights and liabilities of the parties hereto shall be determined in accordance with the [Uniform Partnership Act of the State of Wisconsin ("UPA")] and other relevant laws of the State of Wisconsin."

### 1.4    The Parties' Dispute

According to the record before the court, in October of 2012, Mansfield and Maufras exchanged several e-mails about Maufras's continued involvement in TideTraders. (Docket #25-4). On October 14, 2012, Maufras wrote "I am tired of getting no support from you... TideTraders certainly is not a rewarding venture for me and it may be time for me to move along......" (Punctuation in original). Mansfield sent a long e-mail in reply. In the e-mail Mansfield describes several aspects of his home and professional life. He also responds to the Maufras's statement about quitting with, "You and I both know you don't want to quit. You push yourself and the rest of us too much." Further, Mansfield encourages Maufras to "[s]top talking about quiting [sic] and recognise [sic] this sort of talk as you [sic] body telling you to rest." Maufras sent a lengthy reply that starts with, "I am not sure you fully understand me…I want to sell my stakes in TideTraders." Maufras articulates several business and personality differences between them, concluding that he and Mansfield "cannot get on the same page as business

owners." Maufras writes, "The bottom line is may be [sic] someone else can better understand how to help you in this endeavor...." Maufras concludes his e-mail with a description of their business model's faults, and the following comment:

> Since this is of secondary importance to you, I have to respectfully bail out, because I shall not fail…any longer and need to focus on the future.
>
> I will work out an arrangement to ensure a transition so you and ???? can keep TideTraders going. One that is smooth and not noticeable to subscribers.

(Docket #25-4) (punctuation in original).

Mansfield responded the following day, on October 15, 2012, at 6:22 a.m., stating that he won't stop Maufras if he wants to "bail out." (Docket #28-10). Mansfield instructs Maufras to "write up a proposal to leave" and then states, "If you don't write a proposal to leave or confirm that you have changed your mind I'll begin to construct a proposal with [TideTraders's counsel Michael Haas ("Haas")]...." Mansfield concludes his e-mail as follows: "Sad…just Sad…the door is not shut…think it through…" Five hours later, at 11:28 a.m., Mansfield e-mailed Haas with a copy to Maufras, explaining that Maufras wants to leave TideTraders, and asking Haas to assist in drawing up "exit paperwork." (Docket #28-9). Maufras e-mailed Mansfield at 2:47 p.m.; in his e-mail, Maufras describes two options: (1) "certain things change and I continue with TideTraders as you are suggesting I do"; and (2) "you refuse to change any thing [sic] and we need to part ways amicably but fairly." (Docket #29-10). Maufras then lays out several aspects of their working relationship that he wants to change. He also writes, "So if your intentions are as stated in point #1 above and in your e-mails below,

we'll set to talk this over calmly at a time which is appropriate for both of us. [T]he end result may not be different but at least it will be less impersonal than e-mails."

The next day, October 16, 2012, Maufras sent an e-mail to "Mike," a "TideTraders IT staff member," with a copy to Mansfield; the e-mail lays out a compensation schedule for Mike. The e-mail concludes with, "Lastly, yes it is true that I have told [Mansfield] I would be interested in a buyout offer to sell my stake in TideTraders. If you are interested please contact me." (Docket #28-11).

At 12:16 in the morning on October 17, 2012, Maufras responded to an ongoing string of e-mails about bringing in a business associate called "Tiny." Maufras copied Mansfield on the e-mail, in which he explained to Tiny that he:

> …made no offer to dissolve our partnership. I have told [Mansfield] of my intention to sell my stakes in TideTraders and as so mentioned in our LLP, [Mansfield] has first right to acquire the rights to TideTraders. According to the LLP agreement, until such transaction is made where [Mansfield] would have legally acquired the full rights to TideTraders; [sic] a legal agreement, between TideTraders and you, will required [sic] my approval.

(Docket #28-12). Six hours later, at 6:29 a.m. on October 17, 2012, Mansfield sent the following reply, with a copy to Haas:

> I am not interested in talking directly to you. I will be acquiring your stake in TideTraders under reasonable terms via Michael Haas of Levy & Levy Attorneys. Please contact the attorney and outline what you want. Since you don't want to be part of TideTraders which you made very clear then please get with the attorney and tell him what you want. Please don't drag this out. Also at this time since you have made it clear you want to be "Getting out" and "Sell your stake" there is no reason to

> participate in further TideTraders business. So please discontinue operations on the site or with the staff regarding TideTraders business. All further communications must be through the attorney. You claimed you would make this amicable and fair. So, do it already.

(Docket #28-12). Maufras replied to both Mansfield and Haas, stating that he "plan[s] to continue to support TideTraders until a purchase of [his] interest in TideTraders is complete." In this e-mail, Maufras states that he has been prevented from doing so because Mansfield "alter[ed] the access" to the PayPal account. Maufras explains that he had been maintaining the financial records for TideTraders until that day but can no longer continue without access to the account. Mansfield replied as follows:

> PayPal...I received a suspicious e-mail on this and FaceBook. These were verified to be spammers attempting to gain access to my accounts. Therefore, this caused me to change that single pass word to PayPal and the problem avoided on the TideTraders Facebook. I am happy to share the access to that account but it should no longer be necessary. [Maufras] still has access to the cash in the ING bank account and ALL other parts of the business. I was spammed and simply acted to protect PayPal and TideTraders interests from fraudulent use. Nonetheless, coincidental or not the access for [Maufras] today is no longer necessary. I'll have to keep these records myself now or transfer the responsibility to our accountant and will anticipate the records release to me at my personal address and to our accountant as well.
>
> It makes sense that the remaining staff deal with the subscriptions issues.

(Docket #28-12).

Thus, after receiving Maufras's October 14, 2012 e-mail, Mansfield removed Maufras's access rights to the PayPal account; he also moved the savings to another account to which Maufras does not have access. PF ¶ 22.

About a month later, on November 17, 2012, Mansfield caused Maufras to lose access to the TideTraders website by having it moved to a new server. PF ¶ 21.

In addition to altering Maufras's access to TideTraders' accounts, Mansfield has not paid distributions as TideTraders has in the past. Under the Agreement, the Net Cash Flow is required to be distributed annually unless the partners agree to distribute on a more or less frequent basis. PF ¶ 27. TideTraders's pattern and practice, until October 14, 2012, was to make distributions monthly. PF ¶ 28. TideTraders has not made any distributions since October 14, 2012. PF ¶ 29.

### 1.5 Procedural History

On December 4, 2012, Mansfield filed suit against Maufras in the Ozaukee County Circuit Court, seeking relief in the form of an injunction, and seeking judicial dissolution of and appointment of Mansfield as receiver for TideTraders. (Docket #2). On December 14, 2012, Maufras removed the case to federal court, and filed an answer asserting counterclaims for theft, common-law conversion, specific performance, and an accounting. (Docket #3). On July 29, 2013, Mansfield filed the instant motion for partial summary judgment, seeking dismissal of Maufras's counterclaims for theft and conversion. (Docket #22).

### 2. Statement of Law

The general standard for assessing motions for summary judgment applies, namely: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Material facts" are

those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

3. Analysis

Mansfield's motion proceeds as follows: first, Maufras's e-mail from October 14, 2012, indisputably constitutes a resignation;[2] second, under Wisconsin law and the Agreement, a partner's retirement[3] is an act of dissolution; third, the Agreement provides that TideTraders will continue upon dissolution; fourth, Maufras, as a Partner exiting a continuing partnership, only had an interest in TideTraders as a creditor; fifth, a mere creditor has no right to possess its debtor's property; and sixth, Maufras's claims of theft and conversion fail as a matter of law because Mansfield exerted control over Partnership assets to which Maufras, as a mere creditor, had no legal right.

Maufras opposes Mansfield's motion on several grounds. As to the first step in Mansfield's argument, Maufras states that he did not, in fact, resign from the partnership, but rather that he made an offer to sell his interest in TideTraders. Maufras further argues that an offer to sell a partnership interest is specifically excluded from the dissolution article of the Agreement, and did not cause dissolution of the partnership. With regard to Mansfield's argument that Maufras retired from the partnership, Maufras argues that he did not retire, that the meaning of the word "retirement" is

---

[2] Mansfield appears to utilize "resignation" and "retirement" interchangeably. Brief in Support (Docket #23) at 9-10, 11.

[3] *See* n.1, *supra*.

ambiguous under the Agreement and therefore constitutes a question of fact, and that, even if he is found to have retired, he retained his Partnership Interest until its transfer to the remaining partners. Maufras also argues that none of the communications between Maufras and Mansfield constitute "notice" under the Agreement. Finally, Maufras asserts that he retained a property interest in access to and management of the partnership, and that Mansfield is, therefore, liable for theft and conversion due to his depriving Maufras of access to partnership property.

Mansfield, as movant, bears the burden of showing entitlement to summary judgment. The court thus begins its analysis with step one in Mansfield's argument, namely that Maufras's e-mail of October 14, 2012, constituted a retirement, which dissolved the partnership. In addition to the e-mail, Mansfield offers two excerpts from Maufras's deposition. Maufras was asked, "Is it a fair statement that as of November 4th, 2012, you had reached the decision that you could not continue as a partner with Mr. Mansfield?" Maufras answered, "That was true as of October 14th." In the second excerpt cited by Mansfield, the question put to Maufras was: "As of October 14th, is it true that, in your mind, continuing the partnership was not an option?" Maufras responded, "That is correct."[4] Mansfield's argument thus relies on Maufras's e-mail, together with testimony that Maufras "reached the decision" "in [his] mind" that he could not continue the partnership.

---

[4] The court is unable to verify Maufras's response to this question because the excerpts of the Maufras deposition transcript (Docket #25-1) includes page 99, which concludes with the question, and then skips to page 101. The court thus relies upon the quotation offered in Mansfield's Brief in Support, noting that Maufras did not correct the quotation in his Response Brief in Opposition.

Maufras offers several arguments in response, the most salient of which is that the UPA requires a partner's "express will" to dissolve a Partnership, and that Maufras's e-mail does not demonstrate express will to dissolve the partnership. For all practical purposes, Mansfield accedes to this legal standard; in his Reply Brief he argues that the partnership is dissolved upon retirement of one of the partners, and that retirement "merely requires the *express intent* of any partner 'that he no longer wanted to participate in the partnership.'" (*quoting Lange v. Bartlett*, 360 N.W.2d 702, 703 (Wis. Ct. App. 1984) (emphasis added)). Mansfield does not articulate the distinction between "express will" and "express intent," if any.

The court begins its assessment of the parties' arguments by turning first to the Agreement. The Agreement does not specify a required procedure of notice in the event of retirement. Article XIII(2) of the Agreement provides that the Partnership dissolves upon retirement of any of the Partners, or upon "[t]he occurrence of any other event causing the dissolution of a limited liability partnership under the laws of the State of Wisconsin." How the fact of retirement is to be communicated is not explicitly articulated in the Agreement. Additionally, the Agreement includes a provision stating that the Agreement shall be read in accordance with the UPA and relevant laws of the state of Wisconsin. Lacking any direct instruction from the terms set forth in the Agreement as to the notice that is required, the court thus turns to the UPA for guidance.

The UPA provides that, for partnership agreements that do not specify a "definite term or particular undertaking," dissolution may be caused "[b]y the express will of any partner." Wis. Stat. 178.26 (1)(b). Thus, as Maufras argues, the question of whether Maufras caused the dissolution of the

Partnership on October 14, 2012, turns on whether his statement constituted "express will" of dissolution.

On the question of how to assess "express will," the parties did not cite, and the court was unable to find, any Wisconsin state authority directly on point.[5] However, a recent case from the Supreme Court of Texas, provides a cogent, rational analysis in a similar factual scenario. In *Buck v. Palmer*, the Court held that "statements expressing an intent to dissolve a partnership at some future time do not necessarily constitute an immediate dissolution of partnership as a matter of law...." 381 S.W.3d 525, 526 (2012). In that case, the parties involved, Robert Buck ("Buck"), G.J. Palmer ("Palmer"), and two others, created a partnership to build a marina and yacht club. *Id.* Their venture failed, following a series of major storms and waves of litigation; the litigation culminated in a settlement whereafter Palmer and Buck were the remaining partners. *Id.* Palmer sued Buck for breach of an oral agreement, asserting that Buck promised to transfer his interest to Palmer. *Id.* Palmer also argued that, even absent this oral agreement, Buck relinquished his interest in the partnership when he expressed his will to dissolve the partnership on several occasions, most explicitly in a letter in which Buck wrote to Palmer, "I have no desire to embark into any QID land development scenario with you." *Id.* at 526-27. The trial court granted Palmer's motions, concluding that the letter was "conclusive evidence of dissolution." *Id.* at 527.

---

[5]Mansfield cites *Lange v. Bartlett*, 360 N.W.2d 702 (Wis. Ct. App. 1984), throughout his briefing. In that case, the Wisconsin State Court of Appeals reviewed a trial court's award of interest in a partnership dissolved by retirement of one partner. 360 N.W.2d 702, 703. While this case provides guidance on many aspects of Wisconsin Partnership law, it provides limited assistance at this point in the analysis because, as the Wisconsin State Court of Appeals noted, the question of whether the partner retired was "not in dispute." *Id.*

In reviewing the trial court's work, the Supreme Court of Texas first noted that the Texas Uniform Partnership Act provides that dissolution is caused by the "'express will' of any partner ceasing association with the continued operation of the business." *Id.* Reviewing the evidence in the record, the Court found that, while the record contained some evidence that Buck intended to dissolve the partnership, there was other evidence showing that Buck continued as partner, namely: (1) paperwork subsequent to Buck's letter listing Buck as partner; and (2) Buck's affidavit that he did not intend to dissolve the partnership. *Id.* at 528. The court concluded, "[b]ased on that evidence, reasonable jurors could differ as to whether Buck intended to dissolve the partnership, merely express a desire to relinquish his interest at a later time, or simply engaged in hyperbole in light of his frustrations with the venture's poor performance." *Id.* The Supreme Court of Texas reversed and remanded, holding that the record evinced a genuine issue of material fact as to Buck's intention to dissolve the partnership. *Id.*

Similarities between the current case and the facts of *Buck v. Palmer* abound. First and foremost, the relevant provisions of the Texas and Wisconsin Uniform Partnership Acts contain an identical legal standard: "express will." Second, the record before this court, just like the record before the Texas Supreme Court, contains evidence that is subject to multiple reasonable interpretations, running the gambit from express will to dissolve to, as the Texas Supreme Court described, "hyperbole in light of his frustrations with the venture's poor performance." The record shows that Maufras wrote: "I am not sure you fully understand me…I want to sell my stakes in TideTraders." But, even assuming that the articulation of this desire

would be adequate to dissolve the partnership,[6] the record also includes several contemporaneous statements from Maufras indicating that he intended to continue in his role in the partnership at least long enough to transfer his interest to either Mansfield or another party. First, Maufras states in the October 14, 2012 e-mail that he "will work out an arrangement to ensure a transition so you and ???? can keep TideTraders going. One that is smooth and not noticeable to subscribers." Second, Maufras's e-mail of October 15, 2012, recounts two options: either the partners rework certain aspects of their partnership and remain partners;, or Maufras will leave. Third, on October 16, 2012, Maufras conducted TideTraders business, writing an e-mail providing information regarding compensation to a new IT employee. In the e-mail, Maufras states that he is interested in selling his stakes in the partnership, and inviting the new employee to make an offer; Mansfield was copied on this e-mail. Fourth, on October 17, 2012, Maufras wrote in an e-mail to "Tiny," with a copy to Mansfield, that he did not offer to dissolve the partnership, and instead told Mansfield of his intention to sell his interest in the partnership. Fifth, in Maufras's e-mail dated October 17, 2012, sent to Haas and Mansfield, Maufras states that he intends to support the partnership until sale of his interest is complete.

Additionally, the record includes statements from Mansfield, indicating that he did not interpret Maufras's October 14, 2012 e-mail as an immediate dissolution of their partnership. Mansfield's October 15, 2012 e-mail telling Maufras to "write up a proposal to leave," further commenting

---

[6]A reasonable juror might interpret this statement as "a desire to relinquish his interest at a later time." *Buck*, 381 S.W.3d at 528.

Page 14 of 15

Case 2:12-cv-01277-JPS   Filed 10/07/13   Page 14 of 15   Document 37

that Maufras could either write the proposal or "confirm that [he has] changed [his] mind," and explicitly stating that "the door is not shut."

In sum, the question of whether it was Maufras's "express will" to retire on October 14, 2012, may well be answered in the affirmative, as Mansfield contends. However, considering the record before the court and construing all evidence in a light most favorable to Maufras, as the court is required to do when assessing a motion for summary judgment, the court cannot conclude that the question must only be answered in the affirmative. The remainder of Mansfield's motion flows only from a preliminary finding that Maufras did, in fact, retire on October 14, 2012; accordingly, the court need not address his remaining points of argument. Instead, Mansfield's motion for partial summary judgment must be denied, and a factfinder[7] will have to pass on the evidence.

Accordingly,

IT IS ORDERED that plaintiff's motion for partial summary judgment (Docket #22) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 7th day of October, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

---

[7]This matter is currently set for jury trial to commence on October 28, 2013. (Docket #12). The court notes that the Agreement provides that "any claim or controversy arising out of or relating to this Agreement, or breach of it, shall, upon request of any party involved, be submitted to and settled by arbitration.…" Should either party choose to invoke the arbitration clause, the parties are instructed to notify the court as soon as practicable.